

**FILED**

Sep 24 2019, 9:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Frances Barrow
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA CONNECTIONS
ACADEMY, INC.

Wayne C. Turner
Michael R. Limrick
Amanda L.B. Mulroony
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
ANDREW J. BROWN CHARTER
SCHOOL, INC., ASPIRE CHARTER
ACADEMY, INC., AND NATIONAL
HERITAGE ACADEMIES, INC.

Alan S. Brown
Darren A. Craig
Alexander P. Will
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| State of Indiana; Indiana Department of Education; Eric Holcomb, in his official capacity as Governor of Indiana; and Jennifer McCormick, in her official capacity as Indiana Superintendent of Public Instruction, | September 24, 2019<br><br>Court of Appeals Case No. 18A-PL-2634<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Heather A. Welch, Judge |

*Appellants-Defendants,*

v.

**Indiana Connections Academy, Inc.; Rural Community Schools; Andrew J. Brown Charter School, Inc.; Aspire Charter Academy, Inc.; and National Heritage Academies, Inc.,**

*Appellees-Plaintiffs*

Trial Court Cause No.
49D01-1606-PL-20822

**Baker, Judge.**

[1] Indiana Connections Academy, Inc. (INCA), Andrew J. Brown Charter School, Inc. (AJB), Aspire Charter Academy, Inc. (Aspire), and National Heritage Academies, Inc. (NHA) (collectively, the Charter Schools), instituted litigation against the State, seeking to recover six months of tuition support funding that they argue they are owed.

[2] The trial court ruled in favor of the Charter Schools and the State appeals, raising multiple arguments, one of which we find dispositive: that the trial court erroneously determined that the tuition support funding formula resulted in a six-month funding lag. We find as a matter of law that the General Assembly did not intend the statutory funding formula to result in a six-month funding lag, meaning that the Charter Schools are not entitled to recover the disputed amounts. Therefore, we reverse and remand with instructions to enter judgment in favor of the State.

# Facts[1]

## *Charter School Funding From 2002-2013*

In 2001, the General Assembly enacted the Charter School Act (the Act) to provide an alternative option to traditional public schools. Ind. Code art. 20-24. A charter school is a nonreligious public elementary or secondary school that operates under a charter, which is a "contract between an organizer and an authorizer for the establishment of a charter school." Appellants' App. Vol. VI p. 58. An "organizer" is a nonprofit group that enters into the contract to operate the charter school, *id.* at 59, and an "authorizer" is an entity enabled under the Act to grant a charter to an organizer to operate a charter school, Ind. Code §§ 20-24-1-2.5, 20-24-3-1.

Because charter schools are considered public schools, which may not charge tuition to their students, the State provides tuition support on behalf of their students. Each two-year budget cycle, the General Assembly determines the amount of tuition support to be divided among and distributed to all public schools, including charter schools. The Indiana Department of Education (DOE) is tasked with the ministerial duty of distributing the tuition support funds. The amount of support is determined annually by the DOE and is based on the Average Daily Membership (ADM) of a charter school.

---

[1] We held oral argument in Indianapolis on September 9, 2019. We thank the attorneys for all parties for their superb written and oral advocacy.

Before 2013, charter schools conducted their ADM count in September. They received tuition from the State for their students on a calendar year basis, with the first monthly distribution occurring in January and the final distribution occurring in December. Thus, the ADM count conducted in September triggered a payment stream that began in January. Before 2013, the law provided that the DOE would not make the first distribution of state tuition support until "after December 31 of the calendar year in which a charter school begins its initial operation." I.C. § 20-24-7-2(b) (2011). In other words, a new charter school that opened its doors in the autumn of an academic year would receive its first DOE tuition support payment the following January.

This system created financial hardship for new charter schools, which, unlike traditional public schools, do not have the authority to levy local taxes. When the DOE realized that there was a funding gap for new charter schools, it requested an advisory opinion from the Attorney General in 2002 (the Advisory Opinion). In relevant part, the Advisory Opinion states as follows:

> . . . It cannot be assumed that the General Assembly intended to have the new public schools operate without state tuition funds absent clear language to that effect in the Charter School Act. Therefore, the [DOE] is required both to distribute tuition support and other state funding upon verification of the required information from the charter school organizer *and* to make full state tuition payments to public school corporations.

***

. . . Any analysis of charter school funding requirements must begin with the basic and irrefutable fact that charter schools are *public* schools, "wherein tuition shall be without charge."

\*\*\*

In the absence of a specific legislative directive which indicates that charter schools must operate without state tuition support during the first semester of operation, one may only conclude that charter schools, like all other public schools, are required to be funded with public funds during the first semester of a school year. Indeed, any other reading would require the inference that the General Assembly intended charter schools with inadequate private start-up monies to never open.

\*\*\*

. . . Of equal importance is the fact that the General Assembly did *not* provide that charter schools specifically be required to operate without state tuition funding during the first semester they are in operation.

\*\*\*

The fact that an already-existing school corporation must wait until January for funding adjustments based on September's ADM does not support the argument by correlation that a charter school must wait until January for any state tuition support.

\*\*\*

. . . [T]he statutory framework established by the General Assembly has an inherent time lag of roughly one semester between the time a public school starts a school year and the time

it receives a distribution of state tuition support based on September ADM.

***

I am fully aware that the General Assembly has created what may be termed an "unfunded legislative mandate." It has created a new variety of public school without either (1) addressing the fiscal impact these schools may have on entitlements to existing school corporations, or (2) expressing an intent that charter schools will not receive state tuition support during the first semester of operations.

It is possible, given current budget projections, that the appropriations cap set by the General Assembly in 2001 may be inadequate. This is an issue that the General Assembly created, and one that may require its action to remedy.

The [DOE] may find in the performance of its ministerial duties that it is impossible to satisfy the State's financial obligations to all public schools as required by the General Assembly. In such an event, the General Assembly must supply the [DOE] with the necessary funds to satisfy these obligations. . . .

Therefore, . . . it is my legal opinion that the Charter School Act obligates the [DOE] to distribute tuition support and other state funding upon verification of the required information from the charter school organizer . . . .

Appellants' App. Vol. IV p. 83-88 (emphases original, internal citations omitted).

[7] In the 2003 legislative session after the Advisory Opinion was issued, the General Assembly declined to amend the statute providing that the DOE could not make the first distribution of state tuition support until after December 31 of the calendar year in which a charter school begins its initial operation. It also did not supply the DOE with the necessary funds to enable payment of tuition support for the first semester of new charter schools. Instead, it created the Charter School Advancement Account, which was essentially a government loan available for charter schools to cover operational costs incurred during their opening semester. Ind. Code §§ 20-5.5-7.5-5, -6 (2003).

### Parties' Interpretations

[8] Although we generally do not inject argument into the Facts section of our opinions, we believe it would be helpful in this case to explain the parties' respective interpretations of what the above statutory scheme means in practical terms.

[9] The State believes that it means that charter schools are wholly unfunded for the first semester they are open. Then, beginning in January, they would receive monthly payments based on the ADM count from September, but the tuition support funds would *not* cover the first semester; instead, they would be real-time payments.

[10] The Charter Schools, on the other hand, argue that this process merely resulted in a funding lag:

> Under this methodology, a school would submit an ADM from the September count date, and then IDOE would distribute each school's tuition support in 12 roughly equal monthly payments in the following calendar year. Thus, by way of example, a school would submit its September ADM and IDOE would distribute 12 monthly payments from January through December of the following calendar year.

AJB, Aspire, NHA Appellees' Br. p. 11 (internal citations omitted). Thus, the Charter Schools insist that this system resulted in a six-month funding lag. INCA offered this example by way of explanation: "schools did not receive all the tuition support for the 2011-12 school year—the tuition support tied to its fall 2011 ADM—until December 2012 (halfway through the 2012-13 school year)." INCA Appellee's Br. p. 11.

### *Charter School Funding After 2013*

Effective July 1, 2013, the General Assembly changed the tuition support payment schedule from a calendar year (January through December) to the State's fiscal year (July through June). From that date forward, charter schools would conduct two ADM counts, one in September and one in February. Viewed through the lens of the Charter Schools' interpretation of the former legislative scheme, this change meant that there would no longer be a funding lag; viewed through the lens of the State's position, the change meant that the first semester of operation would no longer be unfunded.

[12] When that law went into effect, charter schools had completed the 2012-2013 school year and had received tuition support through the end of Spring 2013 based on the September 2012 ADM count.

[13] The DOE explained in a memorandum that the September 2013 ADM count would be used to determine tuition support funding from July 1 through December 31, 2013. After the September 2013 ADM count was finalized, the DOE reconciled any remaining payments in November and December to account for any over or underpayments of tuition support.

[14] The DOE continued to use the September 2013 ADM count until the February 2014 ADM count was finalized, which, in turn, was used to determine the tuition support funding for January 1 through June 30, 2014. Again, after the February ADM count was finalized, the DOE accounted for any over or underpayments of tuition support.

[15] In short, charter schools were provided tuition support during this transitional period as follows:

- First half of 2013: under the pre-July 1, 2013, statutes, based on the September 2012 ADM count.
- Second half of 2013: under the 2013 law, based on the September 2013 ADM count.
- First half of 2014: under the 2013 law, based on the February 2014 ADM count.
- Second half of 2014 and beyond: as prescribed by the 2013 law.

Therefore, charter schools were paid tuition support for all times during the transition from the prior statute to the new one.

[16]  This transitional period, however, did not account for the six-month funding lag that the Charter Schools believe was occurring in the prior legislative scheme. Thus, they argue that the State still owes them tuition support funds for a full semester.

### *The Parties and the Litigation*

[17]  Indiana Connections Academy began operating in the 2010-2011 school year as part of a Virtual School Pilot Program.[2] It began receiving basic tuition support in January 2011 based on its September 2010 ADM count. When the pilot program ended, the academy applied to become a charter school. In December 2011, INCA entered into a charter agreement with Ball State University to establish and operate Indiana Connections Academy. INCA became the organizer of Indiana Connections Academy in January 1, 2012.

[18]  In 2003, AJB entered into a charter agreement with the City of Indianapolis. AJB began educating students in August 2003 and received its first tuition support payments in February 2004 based on its September 2003 ADM count. In March 2008, Aspire entered into a charter agreement with Ball State University. It began educating students in August 2008 and received its first tuition support payments in January 2009 based on its September 2008 ADM count. Through a contractual arrangement, NHA operates AJB and Aspire.

---

[2] The Academy's organizer and fiscal agent under the pilot program was Rural Community Schools (Rural). When it was decided that the Academy would apply to become a full-fledged charter school, it transitioned from Rural to INCA as its organizer.

[19] Each of the Charter Schools has received continuous tuition support from the DOE except for their respective first semesters of operation. They all argue that the 2013 transitional period did not account for their first six months of operation and maintain that they should be compensated for that semester.

[20] On June 10, 2016, INCA filed a complaint against the State for breach of contract and declaratory judgment. In its answer, the State asserted counterclaims for unjust enrichment and negligence and filed a third-party complaint against Rural. INCA and Rural both filed motions to dismiss. On October 24, 2017, the trial court granted the motions to dismiss the negligence counterclaim and denied the motion to dismiss the unjust enrichment counterclaim and the third-party complaint.

[21] In August 2017, AJB, Aspire, and NHA filed a motion for permissive intervention and a complaint against the State for mandate, damages, and declaratory, injunctive, and equitable relief. The trial court granted the motion for permissive intervention.

[22] In June 2018, INCA and Rural filed a joint motion for summary judgment and NHA, Aspire, and AJB filed a joint motion for summary judgment. The State filed a cross-motion for summary judgment. On October 2, 2018, the trial court denied the State's cross-motion for summary judgment. It granted the Charter Schools' summary judgment motions with respect to their implied contract

claims and denied their motions with respect to their express contract claims and claims for prejudgment interest.[3]

[23] The State now appeals the grant of summary judgment in favor of the Charter Schools. The Charter Schools, in turn, cross-appeal the trial court's order regarding their express contract claims and argue that they are entitled to statutory late payment penalties and prejudgment interest. INCA also argues that the trial court erred in calculating the amount of damages it is owed.

## Discussion and Decision

[24] The State argues that (1) the Charter Schools received all the funding they were owed because there was no funding lag; (2) the trial court erroneously determined that there were implied contracts between the State and the Charter Schools; (3) there were no express contracts between the State and the Charter Schools; (4) there is no constitutional provision supporting the Charter Schools' claims; and (5) the Charter Schools are not owed interest, penalties, prejudgment interest, a mandate, or recovery on an unjust enrichment claim. As we find the first argument dispositive, we will not consider the remaining issues or the Charter Schools' cross-appeal.

[25] Our standard of review on summary judgment is well established:

---

[3] The trial court also awarded summary judgment in favor of INCA and Rural on the State's unjust enrichment claim. The State does not appeal that portion of the order, meaning that Rural is no longer part of the case.

We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[26] The interpretation of a statute is a question of law to which we apply a de novo standard of review. *Kaser v. Barker*, 811 N.E.2d 930, 932 (Ind. Ct. App. 2004).

[27] The crux of the State's argument is that the public school funding law in effect until July 2013 did not provide for any tuition support during a new public school's first semester of operation. Because there is no dispute that the Charter Schools received tuition support for all but one semester of operation, the State argues that they have received all monies they are owed. The trial court found that the tuition support funding that begins in January of a charter school's first year of operation covered the education provided during the previous Fall semester. In other words, it was tuition support funding in arrears.

[28] We agree with the State that there is no statutory authority suggesting that this funding lag, in fact, existed: "payments were made in real time, for the present

semester, but based on information from the previous September." Appellant's Br. p. 22.[4]

[29] The trial court found, essentially, that the Charter Schools were owed twelve months of tuition support based on the September 2012 ADM count. Because of the change in the funding formula halfway through 2013, which (according to the trial court and the Charter Schools) did not account for the second six months of tuition owed, the Charter Schools are entitled to receive those funds. We agree with the State that this is a fundamental misunderstanding of the prior funding formula:

> the old funding formula never guaranteed two full semesters of tuition support based on a September ADM. Under the old formula schools received twelve months of funding based on the previous September's ADM, *but only because payments were based on a calendar year*. As of July 2013, tuition support for the fall semester would be based on the September 2013 (not the September 2012 ADM), and would be paid on a fiscal year basis.

Appellant's Br. p. 29 (emphasis added).

[30] We also note that as a practical matter, budgets are prospective rather than retrospective. Each two-year budget covers only those two years and cannot reach back to the past to make payments in arrearage. Moreover, if an agency

---

[4] By contrast, the new tuition support funding law effective July 2013 provides for the ADM count to be reported in both September and February, meaning that the necessary information to calculate tuition support is now being provided for the current semesters.

such as the DOE has money left over at the end of a two-year cycle, that money reverts to the State. Consequently, a six-month funding lag would not fit into Indiana's budgeting process.

[31] Because there was no so-called funding lag, it is apparent that the Charter Schools received tuition support funding on a real-time basis. The DOE distributed those funds continuously throughout the transitional period. Therefore, the evidence undisputedly shows that they have received all funds to which they are entitled.

[32] Adding support to this conclusion is the Advisory Opinion, which provided the Attorney General's policy suggestion that the legislature provide funding for a charter school's first semester of operations. But following the issuance of this opinion, the General Assembly did *not* make that change. Instead, the General Assembly created a program whereby a new charter school could apply for a government loan to help it through its first semester of operation, meaning that it did not—as advocated for by the Attorney General—provide the DOE with the necessary funds or authorization to pay tuition for that first semester.

[33] We acknowledge that this result may seem unfair. As noted by counsel at oral argument, this result penalizes charter schools that had the financial wherewithal to operate without State assistance for their first semester. Specifically, charter schools that had to seek a loan from the State under the Advancement Account ultimately had those loans forgiven, whereas the schools that financed their own first semesters are left holding the proverbial

bag with no recourse for recouping those funds. It may also seem unfair that the State expected charter schools to open and operate for a full semester with no tuition support from the government.

[34] But regardless of whether the process and result are fair or unfair, it is solidly within the wheelhouse of the legislature to create a statewide budget and to decide how to fund charter schools, which are a creation of the General Assembly to begin with. The General Assembly has the discretion to decide how to allocate State funds. In this case, it initially decided not to fund the first semester of charter schools' operations. Neither the fact that it decided in 2013 to change that formula nor the fact that the outcome may seem unfair means that there was actionable error in the initial budgeting process.

[35] In sum, while the Charter Schools may argue that it is bad public policy for the legislature to have decided that charter schools should not be funded for their first semester of operation, that does not change the language of the relevant public law, which does not provide for the so-called funding lag. There is no statute providing that the tuition payments beginning in January paid for public education provided the previous fall.

[36] As a final issue, we must address the Charter Schools' argument that the State's interpretation of the tuition support funding formula is unconstitutional because "Article 8, Section 1 requires the State to provide complete tuition support—not tuition support except for one semester. The State cannot abrogate that constitutional duty by statute." AJB, Aspire, NHA Appellees' Br. p. 26. They

insist that the only way in which the tuition support funding formula is constitutional is if we interpret it to impose the so-called funding lag, meaning that charter schools are entitled to tuition support funding for every semester of operation, albeit on a one-semester lag. Were we to agree with the State's interpretation, the Charter Schools argue that it would shift onto them the General Assembly's constitutional duty to provide tuition-free public education.

[37] Initially, we note that the Indiana Constitution does not confer a private right of action for monetary damages. *E.g.*, *City of Indianapolis v. Cox*, 20 N.E.3d 201, 212 (Ind. Ct. App. 2014); *see also Hoagland v. Franklin Twp. Cmty. Sch. Corp.*, 27 N.E.3d 737, 741 (Ind. 2015) (holding that Indiana's Education Clause does not provide a private right of action for monetary damages).

[38] Nevertheless, we observe that while the State is obligated to provide a tuition-free education for Hoosier children, it necessarily fulfills that obligation in the guise of traditional public schools. In other words, even if the charter schools had to be self-funded for their first semester, and even if the charter schools had to close their doors as a result, the children of Indiana were always going to be able to obtain a tuition-free education at traditional public schools. Because traditional public schools have always been an option, the State did not violate any constitutional obligations by structuring its charter school tuition funding in a way that required those schools to fund their own first semesters. Therefore, this argument is unpersuasive.

In sum, from 2002-2013, the way in which the General Assembly structured charter school tuition support resulted in a system requiring those schools to self-fund their first semesters of operation. Nothing in the budget for those years indicates that the legislature intended the tuition support payments to be made in arrears. It is within the purview of the legislature to structure its budgets, and nothing here suggests that it exceeded its discretion. As such, the trial court erred by determining that the Charter Schools are entitled to a semester's worth of tuition support. Therefore, we reverse.

The judgment of the trial court is reversed and remanded with instructions to enter judgment in favor of the State.

Vaidik, C.J., and Altice, J., concur.